May it please the court, I'm Corey Briggs for Appellant. The issue here is not whether the federal government needed to do a terrorism analysis in the first place under NEPA. The question is whether the analysis that they did was adequate. This case, like the... Better replace the battery in my hearing aid. I don't want to miss a word that you have to tell us. Oh, I see. It's working now. I forgot to close it. Your Honor, can you hear me now or do you want me to... No, I hear you fine. Okay, great. So, this case... Let me tell you, who do you represent? The appellant, the San Diego Navy Broadway Complex Coalition. And can you name any people? No, it's a non-profit, 501C3 or 4, I don't remember which one, association with a bunch of members who live in the city of San Diego. How many members? Dozens. How do I know that there's a live person here that you're representing? I'm just curious. Because down below we submitted declarations from members of the organization in order to demonstrate standing, and standing has not been challenged here. Can we inquire into it on our own? I don't know. I'm a district judge. I'm a little out of my water in some senses, many senses. But can we sua sponte? Is it a jurisdictional kind of thing? My understanding... No standing, no case for contrary. It's an Article III requirement. I think that the appellate court can look at standing for the first time on appeal. If the court would like to do that, I'd appreciate an opportunity to brief it so I can point you to what we did down below so that you can see that standing wasn't an issue. Yeah, that's all right. I'm just curious. Would you like me to tell you names of the two members of the board that I take my directions from on the executive committee? Is that helpful for the court? Well, we've got the declarations below. We can go in and look at that. Let's talk about the assessment or the Navy's determination that no further assessment needs to be done. They did consult with a counterterrorism expert, right, who indicated that no specific threats to the facilities. And then did they just end the inquiry there? Yes. So they talked to a person who I understand comes from NCIS, not the TV show but the actual agency within the Navy who does this sort of thing. And that person said we're not aware of any specific threat as to this facility. And then if you look at the backup documentation, the person says there is this generalized national threat and there have been attacks, homegrown attacks, essentially, my phrase. But you can read it and you can see that that's what the person is referring to. We asked Brian Jenkins, who was on a panel that President Clinton put together and has been an expert on this issue, whether that is the appropriate way to look at it. Do you have to know of a specific threat against the facility? And what he said is that statistical probability doesn't work here. The federal government quotes his comment in their opposition brief saying, see, Mr. Jenkins agrees with us, there's no high probability. What he says is you have to look at the patterns. And there are patterns of attacks on diplomatic facilities and there are patterns of attacks on military facilities. Coupled with that, Your Honor, you have anti- Where are those attacks on military facilities in this country within our borders? I think they mentioned Fort Dix as one of them. That is in the federal government's analysis. I'm pretty sure it's Fort Dix they were talking about. I believe that was a conspiracy that the FBI had penetrated, but that's neither here nor there. I don't think there was an actual, quote, attack on Fort Dix. I don't know the specifics, Your Honor. But then Admiral Herring, when he goes to Congress, says we also have the USS Cole incident. It's overseas. And Kobar Towers. And then he says everybody wants to believe that that can't happen in America's finest city. We know that is false. This is the top naval- What more could they have done? I mean, it is, it seems to me sort of a binary problem. You've got, you know, you don't know of any threat on the one hand, and yet there's this kind of generalized concern about military installations, whether here or abroad. But what more could they have done relative to the environmental consequences? Because in addition, I mean, there's a difference between somebody who, you know, takes a firearm on there and starts killing people and somebody who does a Timothy McVeigh kind of thing in a building that will be built in anticipation of that kind of attack. Right. So you're talking about a truly massive kind of, you know, event. Right. And so it's a good question, and context matters. Right now what you have is a low-rise building. What they're proposing is multiple high-rises that is as close to San Diego's waterfront as the street is in front of the courthouse. As the present facility is, too, I assume. It is, but it's low-rise. It's low-rise. It's 40 feet tall. It's low-rise. It's not blast-proof. It's probably packed with asbestos and who knows what. That's right. So if we put high-rises on the waterfront, Mr. Jenkins says those are a good target. They're the sort of things that somebody would want to attack. Then the question is, what are the environmental consequences of that? If those buildings collapse, do we have fire? Do we have explosion? Do we lose infrastructure on San Diego's waterfront? We have a cruise ship terminal. We have a museum across the street close enough that if a building fell, they land on them. If the building falls the other way, it falls on Union Station, the train station in downtown San Diego. These are all issues that would be described in an environmental assessment that adequately looks at the issue. One of the things that the federal government points out is it tries to compare the situation to the New Jersey case from the Third Circuit where they disagreed with Mothers for Peace I. But that body said... Was that the nuclear storage facility? Yes, Your Honor. And it was being re-licensed, right? Everything's the same. They're just getting a new license. We're not leaving everything the same. We are getting a whole new set of buildings, much bigger, much more attractive. But here's an important point that they said, and this is at 561 F. 3rd, Pennsite 143. They say that a terrorist attack of that re-licensed facility would be no worse, the consequences would be no worse than from internally initiated events. In other words, if there were a catastrophe at that facility, the consequences for the community are the same because nuclear facilities could melt down, there could be an accident. Buildings don't explode or fall over on their own. There's nothing about the internal operations of these new high-rises that could cause them to fall over, that could cause them to catch fire, that could cause them to have a blowout and wipe out hundreds if not thousands of people waiting to get into the museum across the street or embarking or disembarking from the cruise ship across the street. Then you're really frightening me now. Well, the point isn't to frighten you, Your Honor. The point is that these are issues that the public should have been told about. It may very well be that the federal government cannot get into specific information. We've never said it has to disclose any sort of security issues. But the public and the decision-makers need to be informed about the potential consequences of this being there. At that point, we can all deal with it like grown-ups. But to say that there's no specific threat, which is exactly the argument that was made in Mothers for Peace 1, and then say, so there's therefore nothing for us to look at when you have the admiral himself saying, it's not true that we're protected, you have USS Cole and Cobar Towers. That's him at Congress giving that testimony. This facility, it's a mixed-use facility and post-construction will still be a mixed-use facility? No, it's not mixed-use now. It's all Navy now. Surrounded in a setting that has office buildings and hotels and so forth? The waterfront is no office buildings. It's the Navy building, then there's museums, cruise ship terminal, restaurants, that sort of thing. You have to go back several blocks inland toward the center of downtown to get to office buildings. But it is surrounded by development, yes. If that's your question. That's what I meant. Yes. When I said, you're really frightening me, that was kind of a facetious statement, because you're not frightening me. I've got great faith in the Navy. We've got the Marine Corps right up the street. They've consulted with government experts. We keep track of these things. We have very good intelligence organizations in this country. We know what's going on. I'm confident of that. What you're saying is that we shouldn't go ahead, we shouldn't develop this property, because there's this threat of something might happen over there. Studies to consider terrorist threats. It's in the record. Isn't that right? That's not correct, Your Honor. Well, they have. You think the Navy is just sat around there drinking coffee all day that haven't thought of these matters? No, that's not the argument. And they've incorporated what they call robust anti-terrorism measures and the redevelopment plans. Your Honor, I think that is a characterization of the record. They've consulted with terrorism experts at NCIS. But what they didn't do, Your Honor, is talk about, they cut off their analysis. They said there's no specific threat and therefore we do not need to do the analysis. Was that the entire linchpin? I mean, that was what? That is the essential premise to the federal government's position. They say there's no specific threat and therefore we need not go into this further. Let me ask you this. I mean, there are attacks and there are attacks. There's the kind of thing that was planned or possibly undertaken at Fort Dixon and elsewhere, and then you've got the Twin Towers. To cause the environmental degradation and the loss of human life that you're talking about, that would take something equivalent to the planes flying into the buildings of the Twin Towers, wouldn't it? Maybe, or a bomb. But these towers are- A bomb of truly massive proportions. And the World Trade Center was bombed before it was hit by planes. I understand. And it withstood that? It did. Although it was not built with the kinds of, I assume, with the kinds of anti-blast considerations that, as I understand it, this record will be built into and designed into these buildings. But the assumption is what's problematic, Your Honor, because in the federal government's opposition brief, they say we will do the site-specific security plan later on. That's problematic. If they know that they need to have a security plan, at a minimum they should be telling the public what the risks are. They don't have to go- As I understand your argument, it's really the leap in logic, right? The assessment that there's no specific threat to this facility, and so therefore it's too remote or speculative to warrant a further look at it. Right, Your Honor. And that's what Mr. Jenkins, that's the purpose of his testimony, that's the reason we refer to Admiral Herring. They are filling in the gaps that would block that leap. They represent a hurdle. You can't get from no specific threat to no reason to do the analysis because of that evidence that's submitted. Let me just close so I have a couple minutes for rebuttal. The Mothers for Peace case talks about three events in the chain that need to be examined. We're here talking about events one and two. It's the connection between one and two, just as in Mothers for Peace, that need to be looked at here. We're not even able to talk about the ultimate consequences because we don't know the connection. It hasn't been explained by the Navy between the federal action and the risk that this facility poses. But they did do more than the NRC did in the Mothers for Peace case, didn't they? I'm sorry, ask that again. The Navy actually has done more once it got over the due process hurdle or the public notice hurdle or whatever. It did more in this case than the agency did in the Mothers for Peace case. In Mothers for Peace 1 or 2? Both. In Mothers for Peace 1, yes. They at least did an EA that said we're not looking at it. In Mothers for Peace 1, they said as a matter of law, we don't have to look at it. In this case, they say as a matter of fact, we don't have to look at it because there's no specific threat. But Mothers for Peace 1 said that rationale isn't enough because we don't need a numeric probability. We need to know whether it is remote and highly speculative. Our evidence and the evidence in the record from our person, Mr. Admiral Herring, is that it's not remote and highly speculative. They're talking about it as a normal part of military operations. Thank you. Thank you. What's wrong with his argument? There are many things wrong with his argument, Your Honor. First of all, NEPA is an environmental statute concerned exclusively with environmental impacts. And here, as this court knows, the Navy has done multiple NEPA documents discussing environmental factors of the redevelopment, such as on water quality, air quality, noise, et cetera. Let me focus on the EA because that's really kind of the heart of their argument is that the EA itself in concluding that there's no specific threat and so therefore that excuses the Navy from doing an analysis of possible environmental impacts. And there seems to be, I think they have a good point in that there seems to be a leap of logic there. And I don't see anything in our case law that says if you have a lack of a specific threat on a facility, then that basically automatically means that it's too remote or speculative to do the NEPA hard look. Now, I don't have the expertise. We don't have the expertise to look into what that hard look would look like. But what NEPA does require is a hard look at possible environmental impact. And here, and tell me if I'm misunderstanding the Navy's argument, but here the argument is that, well, we don't have a specific threat on this facility so therefore we're excused from taking a hard look at possible environmental impacts. Well, I think you may misunderstand the Navy's argument slightly. All right. Well, explain it to me. Okay. So it all boils down to whether or not impacts are likely or probable. If an impact is not likely or probable, then it does not have to be discussed in a NEPA document at all. So what the Navy was trying to do as a factual matter, because this court said in Mothers for Peace you couldn't say terrorist impacts are improbable as a matter of law, that it's a matter of fact, the Navy would set out to make a factual determination as to whether or not terrorist impacts are going to be likely at this location. Why do you have to talk so fast? I'm sorry, Your Honor. I'll slow down. No, I mean... I talk fast as a natural matter. Abraham Lincoln, when he gave the Gettysburg Address. Of course, 47 years ago, our father was one-fourth of the continent, a new nation, and Gettysburg was all but a great equal. I understand. I'll slow down. You know. Okay. I mean, make every word count. Enunciate every word. Okay. You know. To me, words are flying around. Okay. But, in other words, it's the likely or probable standard rather than possible or hypothetical. Right. So the Navy was trying to determine as a factual matter whether or not impacts were likely. And so it consulted its experts, the NCIS, who performed a threat assessment and said that there is no specific threat. And based on that analysis, as well as other things in the record, such as the comments from... So I'm sorry for interrupting, but I don't think I misunderstood the argument then. I may not have stated it as well as I should, but that's what I'm getting at. The Navy did an assessment and said there is no specific threat at this facility, and therefore, as a factual matter, it's too remote and speculative, and that excuses us from having to take a hard look that's required under NEPA. Is that correct? Well, it was not just the NCIS's determination, but also other things in the record, such as the compliance with the anti-terrorism force protection standards, which are the standards, the construction standards that are designed to mitigate the risk of or the impact of a terrorist attack. Right, and I think you're answering a different question. So let me get right to the EA. The relevant paragraph that I'm looking at in the EA is that excerpts of record 179. It says, based on current threat reporting, there is no known specific threat targeting the current or proposed Navy-Broadway complex. The risks of terrorist attacks are too speculative, remote, and removed in order to merit further analysis under NEPA. So as I read that paragraph, what you're saying is there's no specific threat, therefore, it's too remote and speculative, and therefore, we don't have to comply with NEPA. Well, it's not... To me, there's a leap of logic there, because the fact that there's no specific threat doesn't necessarily mean that it's too remote or speculative to comply with NEPA, does it? I think you also have to look at the nature of the impact. And I think a terrorist attack on any particular location in the United States is, by nature, the probability is very low. So then, as a matter of law, I guess you could say, NEPA doesn't apply to these sort of situations. That's what every court has said. Now, this court in Mothers for Peace said... That's the argument that was raised in Mothers for Peace that we rejected. Well, right, the court said you couldn't make that conclusion as a matter of law. That's true. So the Navy was aware of that case, and so what they tried to do is establish as a matter of fact whether or not impacts were likely. And so they consulted the NCIS, and they concluded, as you noted, that there's no specific threat. And it seems to me that I may disagree with Judge Nguyen, but I don't necessarily read that, those two sentences, as the first statement that there's no known threat as leading to a conclusion that, therefore, it's too remote. It seems to me that they're two separate conclusions. There's no known threat, A, and B, in any event, comma, it's simply remote and speculative. I mean, that frames the whole problem. I don't see that there's that sort of linkage that the first sentence is the basis for a conclusion in the second. It's simply saying, well, there's no known threat, and it's simply you look at everything we happen to know about what's going on in the world today, the risk of a terrorist attack striking this development once it's up is too remote and speculative to enable us to make the kind of assessment in detail that has been called for. Right. I think that's exactly right. That's what I was trying to explain to the Court is that the nonspecific nature of the threat was only one thing that the Navy considered when determining that the impacts were unlikely. In addition, the Navy examined the evidence that the plaintiff submitted. It also noted that the facility will be built in compliance with the anti-terrorism force protection standards that will protect or mitigate any impact resulting from a terrorist attack. Now, the unlikely nature is only one reason why NEPA doesn't apply. One other reason is there's no change in the status quo. As the facility sits today, it is a Navy office building that is surrounded by a mix of civilian facilities. After it's redeveloped, it will continue to be a Navy office building surrounded by civilian facilities, except that, as the District Court noted, the facilities will be more modern, improved, and in higher security buildings. I can see that there would also be a more attractive target for terrorists. They're bigger. There's a consolidation of a whole lot of other Navy facilities into one location. As I read everything, I think that sort of cuts against you, but this is my personal view. I understand what you're saying, but my view is there, in fact, there is a – and I understand what you're saying, but I think that goes to the likelihood of the threat, which is a different test. Okay. This goes to – the status quo goes to the physical environmental impacts that would result from an attack. An attack on the building or a complex in the future would be essentially the same as an attack on the building or the facility today. And because there's no change in the status quo, NEPA doesn't apply. I think this situation is also distinguishable from Mothers for Peace and Tri-Valley Cares because what was at issue in those cases was a change in the status quo. They were adding spent nuclear fuel storage to the facility. They were constructing a new biological warfare research facility. Those were facilities housing inherently dangerous substances that, if attacked, could release these substances into the environment. There is no such situation here. The Navy office buildings will not be housing any inherently dangerous substances. And so I think it's self-evident that this case involves different considerations. Now, NEPA requires agencies to focus on disclosing impacts within what the courts have called a rule of reason. There is supposed to be a sort of common sense element to NEPA, and that's because an agency's obligations must remain manageable if it's to achieve NEPA's goals of protecting the natural and physical environment. Not everything that someone may deem adverse is appropriate for discussion in a NEPA document. And here requiring the Navy to analyze the impacts of a terrorist attack, particularly where there's no specific threat to this facility, will consume significant resources without any corresponding benefit. The Navy already expends considerable resources protecting its facilities and its personnel from terrorist attacks. And moreover, the public generally already knows the consequences of an attack on an everyday sort of facility like an office building. Having to detail those consequences in a NEPA document would serve no useful purpose. Outlining attack scenarios is not what Congress had in mind when it enacted NEPA to require agencies to disclose the environmental impacts of their actions. And unless this Court has any questions. Well, the Navy does the analysis for new facilities, right? Just not for this one because it's an existing facility that's being expanded. Well, the Navy would certainly do NEPA analyses and disclose the environmental impacts, but it wouldn't do a terrorism analysis as part of a new facility, no. For the same reasons that we outline here today. Go ahead. Thanks. Your Honors, the standard under Mothers for Peace, it's on page 1030 for the Penn site. It says, the appropriate inquiry is therefore whether such attacks are so remote and highly speculative that NEPA's mandate does not include consideration of their potential environmental effects. It is not remote or speculative given the record you have before you. The Admiral of the Navy in San Diego went to Congress and said, it's not true that coal and cobalt towers won't happen here. You have a person appointed by the President of the United States to an anti-terrorism task force saying this is exactly the sort of thing that terrorists would like to see because you have the benefit of the nearby softer targets. Does the record show the circumstances of what committee he was testifying before and what the purpose of his testimony was? Your Honor, the answer to that question is I'm pretty sure, but I can't tell you the Penn site off the top of my head. I believe we included his resume with the materials. And so the purpose of NEPA is to inform the public. Does the record show what his position was at the time? I believe that it does, yes. If the Court would like something supplemental, one page from your point of view. I think that's okay. Let me just leave you with this thought. The purpose of NEPA is also to inform the public sufficiently that they know that the issues have been considered by the decision makers. It's possible that the Navy has all of the answers. We don't doubt that. Nobody is questioning their integrity or their commitment to protecting the public. Never, ever, ever has that happened. What I am saying is that there is a purpose to be served. It's consistent with Mothers for Peace. And we would ask you to reverse the district court. Thank you. Thank you. The matter is submitted.
judges: Carr, Pregerson, Nguyen